**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| CECILIA PERRY, as Plaintiff Ad Litem for | ) |
| Christina Brooks, and D.B., D.B., D.B., and D.B., | ) |
| by and through their Next Friend, | ) |
| CECILIA PERRY, on behalf of all | ) |
| beneficiaries pursuant to Section 537.080, | ) |
| Mo. Rev. Stat., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        No. 4:17CV981 RLW |
| | ) |
| THE CITY OF ST. LOUIS, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on the separate Motions for Summary Judgment filed by

Defendants Kent Menning and Kevin Stevener (ECF No. 84), Defendants City of Jennings, City

of Jennings Detention Center, Eugene Neal, Rick Crim, Demetrius Staples, Aykan Acikgoz,

Kellye Still, Kyle Bashaw, and Yvette Harris (ECF No. 87), and Defendants City of St. Louis,

Dale Glass, Lynn Page, Jermanda Adams, and Josh Hill (ECF No. 92). This Court previously

issued an Order of Partial Dismissal in favor of Defendants Acikgoz, Bashaw, Crim, Glass,

Harris, Hill, Neal, Page, Stevener, and Still after Plaintiff Cecelia Perry[1] conceded she was not

opposed to summary judgment in favor of those specific defendants. (ECF No. 143) The claims

against Defendants City of St. Louis, Adams, Menning, City of Jennings, and Staples remained

pending. After careful consideration, the Court now addresses the remaining claims.

---

[1] After the original plaintiff in this case, Christina Brooks, died, the Court granted motions concerning the substitution of Cecelia Perry as Plaintiff ad litem for Brooks and the decedent's minor children on behalf of all beneficiaries pursuant to section 537.080, Mo. Rev. Stat. (ECF No. 142)

## BACKGROUND

On October 1, 2014, DeJuan Brison was arrested and booked into the St. Louis City

Justice Center.  (Pl.'s Statement of Additional Undisputed Material Facts ("SAUMF") in Opp'n

to St. Louis City Defs.' Mot. for Summ. J. ¶ 2, ECF No. 105)  At the time of Brison's

confinement, the St. Louis City Justice Center had a "Suicide Prevention/Intervention" policy in

effect (the "Suicide Prevention Policy").  (*Id.* at ¶ 3)  The Suicide Prevention Policy included two

"Crisis Watch Status" designations: full suicide watch and close observation.  (*Id.* at ¶ 4)  An

inmate designated for full suicide watch required, among other things, "[o]bservation of the

inmate in staggered intervals, not to exceed 10 minutes in high risk situations" to include

"recorded observation within each 10 minute interval."  (ECF No. 105-4, at 2)  An inmate

designated for close observation required, among other things, "[o]bservation of the inmate in

staggered intervals, not to exceed 15 minutes, in moderate risk situations" to include "recorded

observation within each 15 minute interval."  (*Id.*)

Both full suicide watch and close observation are defined as "[c]risis levels that identify

the status of inmates, who have been identified by the mental health staff as being at risk of self-

harm, emotionally disturbed or mentally ill and not stabilized on medication."  (*Id.*)  The Suicide

Prevention Policy further provides that an inmate "shall remain on Full Suicide Watch until a

Mental Health Professional determines that the crisis has been resolved or that the inmate can be

placed in a less restrictive watch status."  (*Id.* at 9)  Even after a medical health professional has

determined an inmate should be removed from full suicide watch status, *such an inmate shall be

placed on modified suicide watch/close observation status for at least 24 hours.*[2]  (*Id.*)

---

[2] The forms used to record the cell check observations do not refer to "close observation."  Rather, the forms have
two options after "Suicide Watch Level": "Full" or "Modified."  (ECF No. 105-7)  Deposition testimony from
Jermanda Adams further suggests "close observation" and "modified suicide watch" are used interchangeably.
(ECF No. 105-5, at 13)  Consequently, the Court will use the terms interchangeably.

St. Louis City Justice Center's Suicide Prevention Policy also establishes procedures for transferring inmates who are on crisis watch status. (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J. ¶ 13, ECF Nos. 105) Specifically, "When an inmate on Crisis Watch Status is being released to another law enforcement agency, the Admissions/Processing Staff document in the Admissions/Processing Log Book that the receiving law enforcement agents were informed that the inmate is on a Crisis Watch Status." (ECF No. 105-4, at 12)

When Brison was initially processed at the St. Louis City Justice Center on October 1, 2014, he told the intake officer that he suffered from major depression and had a history of mental health problems. (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J. ¶ 13, ECF No. 105) He also denied any history of psychiatric hospitalization, denied any history of suicide attempts, denied any recent significant loss, denied feeling hopeless, and denied having current suicidal thoughts.[3] (St. Louis City Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 2, ECF No. 93-1)

On October 2, 2014, Brison told a correctional officer that he was feeling suicidal. (*Id.* at ¶ 3) Pursuant to the Suicide Prevention Policy, he was placed on full suicide watch status. (*Id.* at ¶ 5) The following day, a licensed professional counselor, Fred Barker, conducted a mental health assessment of Brison. (St. Louis City Defs.' SUMF ¶ 6, ECF No. 93-1) Barker attests that Brison denied having suicidal thoughts and denied previously indicating he was suicidal. (*Id.* at ¶ 7) After Barker's assessment, Brison was downgraded to close observation. (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J. ¶ 20, ECF No. 105)

---

[3] During a previous confinement at the St. Louis City Justice Center in July 2014, Brison was placed on full suicide watch and modified suicide watch/close observation for a period of eleven days. (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J. ¶ 22, ECF No. 105)

The City of St. Louis learned that the City of Jennings had an outstanding warrant for

Brison and, on the morning of October 4, 2014, St. Louis County Prisoner Conveyance Officer

Kent Menning arrived at the St. Louis City Justice Center to transport Brison to the Jennings

Detention Center. (*Id.* at ¶ 23)  Correctional Officer Jermanda Adams was on duty at the time of

Brison's transfer and was responsible for ensuring all policies were followed, which included

informing transporting officers if an inmate was on full suicide watch of close observation. (*Id.*

at ¶¶ 24-27)  While Adams does not recall her interaction with Brison on October 4, 2014, she

has testified that she reviews the files of inmates who are about to be transferred and informs the

transporting officer if the inmate is on full suicide watch or close observation.[4]  (Pl.'s SAUMF in

Opp'n to Def. Menning's Mot. for Summ. J. ¶ 16, ECF No. 108)  Accordingly, Adams claims

she would have orally informed Menning that Brison was on close observation. (*Id.*)  Menning,

who maintains he recalls specifically his interactions regarding Brison, denies that Adams

informed him that Brison was on close observation at the time of his transfer or had recently

been on full suicide watch.[5]  (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J.

¶ 33, ECF No. 105) (Statement of Material Facts ("SMF") of Def. Kent Menning and Kevin

Stevener in Support of Their Separate Mot. for Summ. J. ¶ 29, ECF No. 85)

St. Louis County conveyance policy required officers confirm that transferees did not

suffer from any mental or medical conditions prior to transporting. (Pl.'s SAUMF in Opp'n to

Def. Menning's Mot. for Summ. J. ¶ 19, ECF No. 108)  St. Louis County conveyance officers

---

[4] According to officials at the St. Louis City Justice Center, every inmate on either full suicide watch or close observation is given a purple armband. (St. Louis City Defs.' SUMF ¶ 34 ECF No. 93-1)  Occasionally, inmates may remove their armbands and a correctional officer is to immediately provide a replacement armband. (*Id.* at ¶¶ 35-36)  Menning has stated Brison was not wearing a purple armband when he was transferred on October 4, 2014. (*Id.* at ¶ 38)

[5] There is also a dispute whether Adams told Menning that Brison was suffering from other medical conditions: he was detoxing at the time and suffered from chronic asthma. (Pl.'s SAUMF in Opp'n to Def. Menning's Mot. for Summ. J. ¶ 16, ECF No. 108)

were further required to confirm the mental or medical condition of a transferee before reporting the inmate's status to the receiving jurisdiction. (*Id.* at ¶ 20) Menning testified that, when he arrived to transport Brison and three other inmates to Jennings, he asked a St. Louis City Justice Center correctional officer if any transferee had a condition he needed to know about, and the correctional officer responded "I don't know." (SMF of Def. Kent Menning and Kevin Stevener in Support of Their Separate Mot. for Summ. J. ¶ 30, ECF No. 85) According to Menning, he then asked the group of transferees whether there were any problems that he should know about and no one spoke up about any medical or mental condition.[6] (*Id.* at ¶¶ 31-33)

In 2013, the City of Jennings Detention Center implemented a policy that provides "[i]nmates cannot be accepted into the Jennings Department of Corrections and have to remain in the custody of the arresting or transporting officers" if the inmate, among other conditions, "is in need of medical attention," "is in need of psychiatric evaluation or observation," or "requires *other special needs* that the facility cannot reasonably provide." (ECF No. 89-20, at 2) An additional "Mental Disability & Suicide Intake" form included a "Questionnaire for Detainee"[7] and "Observation Questions."[8] (*Id.* at 6)

During the booking process on October 4, 2014, Demetrius Staples asked Brison and the other transferees if they were having any mental issues. (City of Jennings Defs.'s Statement of Uncontroverted Material Facts ("SUMF") in Support of Their Mot. for Summ. J. ¶ 19, ECF No. 89) During this group questioning, Brison did not verbally indicate he was experiencing any mental health issue. (*Id.* at ¶ 20) Later, Brison indicated that he believed he was having an

---

[6] Menning testified Brison was not wearing a purple armband indicating he was on full suicide watch or close observation and that he checked each transferee's pockets and did not find any removed purple armbands. (SMF of Def. Kent Menning and Kevin Stevener in Support of Their Separate Mot. for Summ. J. ¶¶ 34-40, ECF No. 85)
[7] These questions for the inmate to answer included "Have you ever received MHMR Services or other mental health services?" and "Do you know where you are?" (ECF No. 89-20, at 6)
[8] These questions for a staff member to answer included "Does the individual act or talk in a strange manner?" and "Does the individual seem usually confused or preoccupied?" (ECF No. 89-20, at 6)

asthma attack, and staff called emergency medical services. (*Id.* at ¶ 21) Personnel from a local hospital responded and attended to Brison for more than ten minutes and left the detention center after measuring Brison's oxygen levels as between 99% and 100%. (*Id.* at ¶ 23) Brison was then placed in a holding cell separate from other inmates after some became upset at being forced to vacate the booking area while he received medical attention. (*Id.* at ¶¶ 25-27) Approximately forty-one minutes after Brison was placed in a single cell, he was found unconscious and hanging from the bars of his cell with a blanket wrapped around his neck. (*Id.* at ¶ 28) Brison was transported to a hospital and placed on life support. He died on October 21, 2014, without regaining consciousness.

Brison's mother, Christina Brooks, initially filed suit in state court against (1) the City of St. Louis, the St. Louis Justice Center, St. Louis Corrections Commissioner Dale Glass, and corrections officers Joshua Hill, Carl Myers, Lynn Page, and Jermanda Adams (referred to collectively as "the St. Louis Defendants"); (2) St. Louis County police officer Kent Menning; and (3) the City of Jennings, the Jennings Detention Center, Jennings Department of Corrections official Eugene Neal, and corrections officers Rick Crim, Demetrius Staples, Aykan Acikgoz, Kellye Still, Kyle Bashaw, Yvette Harris, and Kevin Stevener (referred to collectively as "the Jennings Defendants"). In her Petition (ECF No. 3), Brooks asserted the following claims: state-law negligence claims against the St. Louis City Justice Center Correctional Officers and Menning (Count I), the City of St. Louis (Count II), St. Louis City Justice Center (Count III), Jennings Detention Center Correctional Officers (Count VII), the City of Jennings (VIII), and the City of Jennings Detention Center (Count IX); claims brought pursuant to 42 U.S.C. § 1983 alleging deliberate indifference against the City of St. Louis (Count IV), St. Louis City Justice Center (Count V), St. Louis City Justice Center Correctional Officers (Count VI), the City of

Jennings (Count X), the City of Jennings Detention Center (Count XII), and the Jennings

Detention Center Correctional Officers (Count XIII); and a claim against the City of Jennings

alleging it operates a "debtors' prison" in violation of § 1983 and the First, Fourth, Sixth,

Thirteenth, and Fourteenth Amendments to the United States Constitution (Count XI).  Brooks

seeks compensatory damages in excess of $2,000,000.00, punitive damages in excess of

$5,000,000.00, and attorneys' fees and costs incurred in this action.

The Jennings Defendants removed the case to this Court, invoking federal question

jurisdiction pursuant 28 U.S.C. § 1331.  *See* 28 U.S.C. § 1441(a).  This Court has previously

dismissed Counts II, III, V, IX, and XII as well as the official-capacity claims in Count XIII

against Acikgoz, Bashaw, Crim, Harris, Neal, Staples, and Still.  (ECF Nos. 33, 34, 63, 64)

Further, this Court granted partial summary judgment in favor of Defendants Acikgoz, Bashaw,

Crim, Glass, Harris, Hill, Neal, Page, Stevener, and Still after Plaintiff conceded she was not

opposed to such an order.  (ECF No. 143)  The separate motions for summary judgment related

to the remaining claims against Defendants City of St. Louis, Adams, Menning, City of Jennings,

and Staples will now be addressed.

## **LEGAL STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986);

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law

determines which facts are critical and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly

preclude summary judgment. *Id.* Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. *Id.*

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex Corp.*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson*, 643 F.3d at 1042 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

## NEGLIGENCE CLAIMS

### *(a) Adams*

Missouri courts have long-applied the doctrine of official immunity to tort claims against public officials. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008) (en banc), *as modified on denial of reh'g* (Sept. 30, 2008); *Letterman v. Does*, 859 F.3d 1120, 1125 (8th Cir. 2017). "This judicially-created doctrine protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts. The official immunity doctrine, however, does not provide public employees

immunity for torts committed when acting in a ministerial capacity." *Southers*, 263 S.W.3d at

610 (citation omitted).

> Whether an act can be characterized as discretionary depends on the degree of reason and judgment required. [*Kanagawa v. State*, 685 S.W.2d 831, 835 (Mo. 1985) (en banc), *overruled on other grounds by Alexander v. State*, 756 S.W.2d 539 (Mo. 1988) (en banc).] A discretionary act requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued. *Id.* A ministerial function, in contrast, is one "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Id.* (internal citations omitted). The determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity. *Id.* Even a discretionary act, however, will not be protected by official immunity if the conduct is willfully wrong or done with malice or corruption. *Schooler v. Arrington*, 106 Mo. App. 607, 81 S.W. 468, 469 (1904).

*Id.* at 610-11; *see also Brown v. City of Golden Valley*, 574 F.3d 491, 500 (8th Cir. 2009)

("When an official is exercising such discretionary functions, official immunity applies unless a

willful or malicious wrong is committed.") (internal quotation marks omitted).

Adams argues the Court should grant summary judgment on Count I in her favor because

she is protected from any liability for Brison's death based on the doctrine of official immunity.

Plaintiff asserts Adams is liable under a theory of negligence notwithstanding her status as a

public official because she failed to perform a ministerial duty: inform Menning or the City of

Jennings that Brison was on close observation. Because St. Louis City Justice Center's Suicide

Prevention Policy required staff to inform receiving law enforcement agents that a transferee was

on a crisis watch status, Plaintiff claims Adams did not have the discretion necessary to avail

herself to the protection of official immunity.

In *Letterman v. Does*, 859 F.3d 1120 (8th Cir. 2017), parents of a deceased state prisoner sued correctional officers for the wrongful death of their son after he died while on suicide watch. The prison facility had in place a close observation policy, which required officers to check on a subject prisoner every fifteen minutes, record their observations in a close observation log, and report a medical emergency if, during a check, the officers "could not observe movement, obtain a verbal response, or see breathing." *Id.* at 1123. The plaintiffs' son hit his head on the doorjamb while he was under close observation, which caused a noise loud enough to prompt an officer to check on him. *Id.* Lying on the ground, the prisoner waived his hand in response to the officer's question and the log noted the prisoner was "good." *Id.* Subsequent checks yielded some physical movements but never a verbal response. *Id.* After some time, a nurse determined he needed immediate medical attention. *Id.* The prisoner was taken to a hospital, where he later died of subdural bleeding caused by a head injury. *Id.*

The correctional officers in *Letterman* argued they were protected from liability by official immunity because compliance with the prison facility's policies required exercise of discretion to determine if a prisoner's non-responsiveness was due to sleep or a medical emergency. *Id.* at 1126. The Eighth Circuit disagreed and held that the correctional officers were not entitled to official immunity because their failure to follow the institution's close observation policies constituted a ministerial duty. *Id.* at 1126-27.

> The close-observation policy requires officers to check on the inmate every fifteen minutes and report as a medical emergency any instance when they cannot observe movement or obtain a verbal response or when it appears that the inmate is not breathing. Whether the inmate is asleep is irrelevant, because the movement requirement may be satisfied by the rise and fall of the inmate's chest as he breathes. *The duty to report a medical emergency when one of these criteria is met is mandatory and does not depend on the officer's assessment of whether a medical emergency actually exists.*

*Id.* (emphasis added).

As in *Letterman*, the St. Louis City Justice Center's Suicide Prevention Policy did not provide Adams with the discretion in this situation. The Suicide Prevention Policy mandated Adams inform Menning that Brison was on close observation without regard to her own determination as to Brison's mental health or suicide risk. There exists, however, a genuine dispute in the record before this Court whether she did so.[9]  Further, Barker's lowering of Brison's crisis watch status does not have a talismanic effect on Adams's potential liability.  As the Missouri Supreme Court has made clear, "A ministerial function . . . is one 'of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, *without regard to his [or her] own judgment or opinion concerning the propriety of the act to be performed*.'" *Southers*, 263 S.W.3d at 610-11 (emphasis added) (quoting *Kanagawa*, 685 S.W.2d at 835).  The fact that Barker evaluated Brison and made a determination that Brison should no longer be on full suicide watch nevertheless resulted in Brison remaining on modified suicide watch/close observation at the time of his transfer to the Jennings Detention Center via Menning.

Adams also argues the Court should grant summary judgment in her favor on Count I because Brison's suicide was a new and independent intervening act that broke the causal connection between any alleged negligent act on her part and Brison's death. *See Harden ex rel. Estate of Travis v. St. Louis Cty.*, No. 404CV602(CEJ), 2005 WL 1661505, at *3 (E.D. Mo. July 5, 2005) (citing *Eidson v. Reproductive Health Servs.*, 863 S. W. 2d 621, 627 (Mo. Ct. App.

---

[9] In her joint memorandum along with the City of St. Louis, Adams asserts that there is no evidence she was aware Brison was on close observation and, therefore, there was no requisite "state of facts" mandating her performance of a purely "ministerial" duty. (St. Louis City Defs.' Mem. of Law in Support of Mot. for Summ. J., ECF No. 93, at 14) *See Southers*, 263 S.W.3d at 610-11.  At her deposition, Adams testified she did not specifically recall her interactions with Brison; however, she stated she would have orally informed Menning that Brison was on close observation if Brison was on a crisis watch status at the time of his transfer. (Adams Dep. 7:18-8:1; 45:22-48:16) Menning, meanwhile, maintains he specifically recalls Brison and has testified no one communicated Brison was on a crisis watch status at the time of transfer. (Menning Dep. 68:17-69:6; 71:19-72:24)

1993)).  Plaintiff, on the other hand, asserts that Brison's death was foreseeable because St. Louis City Justice Center's purpose in maintaining a Suicide Prevention Policy, which included specific procedures for informing receiving law enforcement agencies if a transferee was on a crisis watch status, was to ameliorate the risk of an inmate who has been determined to have a substantial risk of suicide from harming himself or herself.

The Court has already rejected Adams's argument.  In denying the St. Louis defendants' motion to dismiss, the Court[10] explained that Brison's suicide does not cut off the potential causal link from the defendant's actions.

> Once it is established a defendant's conduct "has in fact been one of the causes of the plaintiff's injury, there remains the question whether the defendant should be legally responsible for the injury." [*Conn v. City of Reno*, 591 F.3d 1081, 1100 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011)] (citations omitted).  The defendants' conduct is not the proximate cause of the alleged injuries "if another cause intervenes and supersedes [their] liability for the subsequent events."  *Id.* at 1101 (citations omitted).  However, "*foreseeable* intervening causes . . . will not supersede the defendant's responsibility."  *Id.* (emphasis added).  If "reasonable persons could differ" over the question of foreseeability, "summary judgment is inappropriate and the question should be left to the jury."  *Id.*

(ECF No. 33, at 9-10)  The Court holds that a reasonable jury could find that Brison's suicide was a natural and probable consequence of Adams's alleged failure to inform Menning about Brison's crisis watch status at the time of his transfer.  Consequently, Adams's motion for summary judgment with respect to Count I is denied.

### *(b) Menning*

"Qualified immunity protects governmental officials from liability for civil damages if they have not violated 'clearly established statutory or constitutional rights of which a reasonable

---

[10] This case was originally assigned to the Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri, now retired.

person would have known.'" *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To defeat qualified immunity, the plaintiff has the burden to prove: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (quoting *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)). "In the jail suicide context, qualified immunity is appropriate when a plaintiff 'has failed to show . . . that his jailers have acted in deliberate indifference to the risk of his suicide.'" *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir. 2012) (quoting *Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991)).

Prisoners and pretrial detainees have a "clearly established constitutional right to be protected from the known risks of suicide and to have [their] serious medical needs attended to." *Whitney v. City of St. Louis, Mo.*, 887 F.3d 857, 860 (8th Cir. 2018) (alteration in original) (quoting *Yellow Horse v. Pennington Cty.*, 225 F.3d 923, 927 (8th Cir. 2000)); *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003). "The Eighth Amendment prohibits jail officials from acting with deliberate indifference towards risks of suicide." *Whitney*, 887 F.3d at 860 (citing *Coleman*, 349 F.3d at 538). The Eighth Circuit has established that a determination of an official's deliberate indifference requires an objective and subjective analysis. *Id.* (citing *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)). Consequently, Plaintiff must show that (1) the specific defendant had actual knowledge that Brison posed a substantial risk of suicide and (2) the defendant failed to take reasonable steps to abate that risk. *Id.* (citing *Coleman*, 349 F.3d at 538).

The Eighth Circuit has made clear that an inmate's suicide itself is not probative of the question whether correctional officials' measures taken "were so inadequate as to be deliberately indifferent to the risk" of suicide because

> "tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions," and to ensure against suicide ever happening. [*Rellergert*, 924 F.2d at 796.] This is not the constitutional test. Instead, we must objectively "consider[ ] the measures taken in light of the practical limitations on jailers to prevent inmate suicides." *Id.* "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." *Id.* at 797. "In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be." [*Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000)].

*Luckert*, 684 F.3d at 818 (second alteration in original, footnote omitted).

Menning argues he was not deliberately indifferent to Brison's risk of suicide. Contrary to Adams's deposition testimony, Menning maintains he was not informed Brison was on close observation at the time of his transfer. In addition to reviewing the booking sheet that would have contained relevant information related to transferees' medical conditions, Menning testified he asked a correctional officer at St. Louis City Justice Center and the group of transferees if he needed to know anything about their conditions. He also said he makes his own determinations of inmates' conditions and received crisis intervention training in addition to in-service training for mental health screening. Based on his training, experience, observation, and judgment, Menning claims he made a judgment that Brison was not exhibiting suicidal ideation and was not in crisis.

Plaintiff, on the other hand, argues Menning is not entitled to qualified immunity because he has admitted to not following St. Louis County policies and procedures related to transferring inmates. During Menning's deposition, Plaintiff's counsel asked: "What you should have done under the policy of protocol, procedure and training and practice of St. Louis County is get an

affirmative regarding DeJuan Brison's medical condition before you ever relayed that information to Jennings; correct?" (Menning Dep. 88:22-89:1)  Menning answered, "Correct." (*Id.* at 89:2)  He further confirmed that St. Louis County's policies are "nondiscretionary." (*Id.* at 100:12-101:3)

This Court previously denied Defendants Adams, Glass, and Page's motion to dismiss based on qualified immunity.  In that Memorandum and Order, the Court relied in part on an opinion from the Seventh Circuit.

> In *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003), cited by plaintiff, the defendant police officer was told in some detail by Cavalieri's mother that he had suicidal tendencies.  After Cavalieri was transferred to a county jail, the defendant checked on him by telephone but never informed jail officials that he presented a risk of suicide.  Cavalieri attempted to hang himself in the booking area and was in a permanent vegetative state.  The defendant argued that there was not a clearly established obligation to communicate information regarding a detainee's suicide risk upon transfer to another custodian.  The Seventh Circuit disagreed.  First, Cavalieri's "right to be free from deliberate indifference to suicide" was "clearly established." *Id.* at 623.  It was also clearly established that the defendant had an obligation to pass along information regarding a detainee's medical condition. *Id.* (citing *Egebergh v. Nicholson*, 272 F.3d 925, 927–28 (7th Cir. 2001) (denying a qualified immunity defense where police officers knew that the arrestee was an insulin-dependent diabetic, knew that such people need regular insulin injections, knew that the failure to give injections was potentially fatal, and nonetheless failed to make sure the injections were given, with fatal consequences)).  By analogy, it was clearly established that the police officer had an obligation to inform the county jail that Cavalieri posed a risk of suicide.

(ECF No. 33, at 6-7). *See also Conn*, 591 F.3d at 1102 ("When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety.  Thus, the constitutional right at issue here has been clearly established.").

While the Seventh Circuit's opinion in *Cavalieri* is not binding authority in this district, this Court nevertheless finds it persuasive in the absence of contradictory Eighth Circuit precedent.  If a transferring law enforcement agency fails to notify a receiving law enforcement

agency that an inmate posed a substantial suicide risk, such conduct would violate the clearly established constitutional principal that inmates have a right to be free from deliberate indifference to suicide risk.[11] Here, there exists a genuine dispute as to whether Adams in fact informed Menning that Brison was on a crisis watch status at the time of his transfer. Further, Menning's alleged failures to follow St. Louis County policy do not automatically constitute deliberate indifference. An official's actions that may "constitute poor judgment, negligence, or possibly even gross negligence" will not establish deliberate indifference if the official also took "affirmative, deliberative steps" to prevent an inmate's suicide. *Luckert*, 684 F.3d at 818-19. While Menning has presented testimony that could support his argument that he did not show deliberate indifference towards a potential suicide risk, a reasonable jury could find otherwise if it believes Adams informed him that Brison was on close observation at the time of his transfer and he failed to take appropriate steps. Accordingly, the Court holds that Menning is not entitled to qualified immunity.

Menning also argues he is protected from liability by the doctrine of official immunity. He claims he made a judgment call concerning Brison's possible suicide risk and asserts Plaintiff

---

[11] The St. Louis Defendants attempt to distinguish *Cavalieri* by noting the defendant police officer in that case remained personally involved with the decedent and continued to participate in interviews with both the decedent and the decedent's ex-girlfriend after the decedent's transfer. 321 F.3d at 619. Here, there is no evidence that the individual defendants, including Adams, remained personally involved with Brison after releasing him to Menning. This difference is immaterial. Even if this Court found this factual difference significant, it would be *against* the defendants' favor. The dissenting circuit judge in *Cavalieri* noted the defendant police officer's "rather intensive involvement with [the decedent] should reduce rather than increase his liability for deliberate indifference." *Id.* at 625 (Manion, J., dissenting) (citing *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998)). Here, the St. Louis Defendants did not continue their involvement with Brison after his transfer that might have demonstrated a lack of deliberate indifference. Regardless, the majority in *Cavalieri* held that the defendant police officer's prolonged involvement presented him with multiple opportunities to inform the receiving facility that the inmate presented a suicide risk. *Id.* at 622 (majority). As explained above, this Court finds the majority's holding persuasive.

has not offered evidence that he committed a willful or malicious wrong. *See Southers*, 263

S.W.3d at 610-11; *Brown*, 574 F.3d at 500. The Court, however, finds that Menning's obligation

to inform Jennings if Brison was on close observation was a ministerial duty. As with Adams,

Menning had no discretion to deviate from the mechanical procedures outlined in St. Louis

County's conveyance policies: if Menning was informed that Brison was on close observation,

he was obligated to inform Jennings. Because there is genuine question whether Adams told

Menning that Brison was on close observation, Menning is not entitled to official immunity at

the summary judgment stage. Menning's motion for summary judgment with respect to Count I

is denied.

### *(c) City of Jennings*

"Under Mo. Rev. Stat. § 537.600, public entities enjoy sovereign immunity . . . unless

immunity is waived, abrogated, or modified by statute." *Richardson v. City of St. Louis*, 293

S.W.3d 133, 136 (Mo. Ct. App. 2009) (citation omitted). "A municipality has sovereign

immunity from actions at common law tort in all but four cases." *Bennartz v. City of Columbia*,

300 S.W.3d 251, 259 (Mo. Ct. App. 2009). These four exceptions include:

> (1) where a plaintiff's injury arises from a public employee's negligent operation
> of a motor vehicle in the course of his employment (section 537.600.1(1)); (2)
> where the injury is caused by the dangerous condition of the municipality's
> property (section 537.600.1(2)); (3) where the injury is caused by the municipality
> performing a proprietary function as opposed to a governmental function (*State ex
> rel Board of Trustees of the City of North Kansas City Memorial Hospital*, 843
> S.W.2d 353, 358 (Mo. banc 1993)); and (4) to the extent the municipality has
> procured insurance, thereby waiving sovereign immunity up to but not beyond the
> policy limit and only for acts covered by the policy (section 537.610).

*Id.* at 259. "When bringing claims against a public entity, a plaintiff 'bears the burden of

pleading with specificity facts giving rise to an exception to the rule of sovereign immunity[.]'"

*Wann v. St. Francois Cty., Mo.*, No. 4:15CV895 CDP, 2016 WL 866089, at *7 (E.D. Mo. Mar. 7, 2016) (quoting *Richardson*, 293 S.W.3d at 136–37).

The City of Jennings argues the Court should grant summary judgment in its favor on Count VIII because it is entitled to sovereign immunity and Plaintiff has failed to adequately plead or produce evidence that it has waived such immunity as a result of any dangerous condition. Plaintiff, on the other hand, argues the City of Jennings has waived sovereign immunity by purchasing liability insurance that provides coverage for these claims.

In *State ex rel. City of Grandview v. Grate*, 490 S.W.3d 368, 369 (Mo. 2016) (en banc), plaintiffs brought common law tort claims against the city for wrongful arrest, battery, malicious prosecution and negligence arising out of the actions of four police officers. The city sought summary judgment based on sovereign immunity. *Id.* The plaintiffs argued the city had waived sovereign immunity by procuring insurance that provided coverage for the claims. *Id.*

The Supreme Court of Missouri concluded that the central issue was "whether that policy waived the grant of sovereign immunity provided for under § 537.600 or whether there were terms of that policy preserving the grant of sovereign immunity." *Id.* at 371-72. Section 71.185.1, Mo. Rev. Stat., provides the following:

> Any municipality engaged in the exercise of governmental functions may carry liability insurance and pay the premiums therefor to insure such municipality and their employees against claims or causes of action for property damage or personal injuries, including death, caused while in the exercise of the governmental functions, *and shall be liable as in other cases of torts for property damage and personal injuries including death suffered by third persons while the municipality is engaged in the exercise of the governmental functions to the extent of the insurance so carried.*

(Emphasis added). Additionally, section 537.610.1, Mo. Rev. Stat., provides:

> Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of *and only for the purposes covered by such policy of insurance purchased* pursuant to the provisions of this section and in such

> amount and for such purposes provided in any self-insurance plan duly adopted by
> the governing body of any political subdivision of the state.

(Emphasis added). The policy at issue in *City of Grandview* "expressly disclaims a waiver of sovereign immunity, and provides coverage to the City only for those claims for which sovereign immunity has been statutorily waived." 490 S.W.3d at 372. Consequently, the Supreme Court of Missouri held "the City did not waive sovereign immunity when it purchased an insurance policy that disclaimed coverage for any actions that would be prohibited by sovereign immunity." *Id.*

Here, the City of Jennings has purchased an insurance policy that covers "all damages resulting from a wrongful act(s) which arise out of law enforcement activities" so long as the "wrongful act(s) . . . occur during the policy period and within the policy territory." (ECF No. 111-10, at 3) The term "wrongful act" is defined to include "an actual or alleged error or omission, negligent act, neglect or breach of duty by an insured while conducting law enforcement activities, which result in . . . bodily injury," which is defined to include "physical injury to a person including death." (*Id.* at 6-7) The insurance policy explicitly provides the following with respect to the potential use of sovereign immunity as a defense to covered claims against the City of Jennings:

> It is agreed that the Company will not avail itself of the defense of sovereign
> immunity to which the named insured may be entitled by reason of its being a public
> and/or governmental entity, *unless the named insured requests the Company to
> raise such defense by written notice to the Company*. It is further agreed that the
> named insured hereby releases the Company from all liability because of the failure
> on the part of the Company to raise such defense, except in cases where the named
> insured specifically requests the Company to do so in a manner provided herein.

(*Id.* at 10-11) (emphasis added)

Plaintiff has offered evidence that the City of Jennings has procured liability insurance that would apply to Count VIII. Because the City of Jennings has failed to respond to this

argument or offer evidence that it complied with the insurance policy by requesting the provider

specifically raise sovereign immunity as a defense to these claims, the Court denies the City of

Jennings's request for summary judgment on Count VIII.

The City of Jennings also argues Plaintiff is not entitled to punitive damages for her

negligence claim as a matter of law. *See* Mo. Rev. Stat. 538.610.3; *City of Newport v. Fact*

*Concerts, Inc.*, 453 U.S. 247, 263, 271 (1981). Plaintiff does not oppose summary judgment as to

her request for punitive damages based on the actions of Defendant City of Jennings (Count VIII[12]

and Count X), but she does oppose summary judgment as to her request for punitive damages based

on the actions of Defendant Staples (Count VII). (Pl.'s Mem. in Opp. to Defs. City of Jennings and

Demetrius Staples's Mot. for Summ. J., ECF No. 110, at 1) Accordingly, the Court grants

summary judgment in favor of the City of Jennings with respect to Plaintiff's claim for punitive

damages as to Counts VIII and X.

### (d) Staples

The Court need not address the subjective analysis for determining whether a jail official

acted with deliberate indifference towards risks of suicide – i.e., whether the official failed to

take reasonable steps to abate the inmate's suicide risk – if the plaintiff has not satisfied the

*objective* analysis. *See Whitney*, 887 F.3d at 860. Because Plaintiff has not offered evidence that

Staples *actually knew* Brison posed a substantial risk of suicide,[13] the Court does not need to

evaluate the reasonableness of the steps taken during the booking process to reach a conclusion

on Staples's right to summary judgment with regard to Plaintiff's negligence claim. *See*

---

[12] The first page of Plaintiff's Memorandum in Opposition to the City of Jennings and Staples's Motion for Summary Judgment says, "Plaintiff does not oppose summary judgment as to her request for punitive damages based on the actions of Defendant City of Jennings (Count *VII* and Count X)." (ECF No. 110, at 1) (emphasis added) The Court presumes this is a typographical error as Count VIII is the negligence claim against the City of Jennings and Count VII is the negligence claim against Staples.

[13] Regardless of whether the jury finds that Adams told Menning that Brison was on close observation at the time of his transfer, Plaintiff has offered no evidence to suggest Staples *actually knew* Brison was a suicide risk.

*Whitney*, 887 F.3d at 860; *Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 906 (8th Cir. 2001)

("[T]here is no evidence to indicate that [jail] or its employees had actual knowledge that [the

decedent] posed a serious risk of harm to himself. In the absence of such evidence, the plaintiff

cannot show that [jail] personnel were subjectively deliberately indifferent to his need for

medical care."). Accordingly, the Court holds that Staples is entitled to qualified immunity and

grants summary judgment in favor of Staples on Count VII.

## CONSTITUTIONAL CLAIMS UNDER § 1983

42 U.S.C. § 1983 was designed to provide a "broad remedy for violations of federally

protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). Section 1983

provides no substantive rights; it merely provides a remedy for violations of all "rights,

privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C.

§ 1983; *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994) (section 1983 "merely provides a

method for vindicating federal rights elsewhere conferred"). To state a claim under § 1983, a

plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the

United States, and (2) that the alleged deprivation of that right was committed by a person acting

under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1.  Municipal Liability

"In an action under § 1983, a municipality . . . cannot be liable on a respondeat superior

theory, but can be held liable if a constitutional violation resulted from a municipal policy or

custom." *A.H. v. St. Louis Cty., Mo.*, 891 F.3d 721, 728 (8th Cir. 2018). "Only where a

municipality's failure to train its employees in a relevant respect evidences a 'deliberate

indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a

city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489

U.S. 378, 389 (1989). Therefore, municipal liability will apply in two situations: "where a municipal policy is itself unconstitutional, and where the municipality's deliberate indifference to the need to train and supervise its employees causes an employee to violate a third party's constitutional rights." *A.H.*, 891 F.3d at 728. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

### *(a) City of St. Louis*

The City of St. Louis argues it is entitled to summary judgment on Count IV because Plaintiff cannot establish that it was deliberately indifferent by failing to train its correctional officers to properly care for and supervise inmates. According to the City of St. Louis, every one of its correctional officers received annual training on the Suicide Prevention Policy in addition to being trained in the Corrections Academy on suicide prevention, which includes identifying suicidal indicators and knowing to whom they should report the appearance of such suicidal indicators.

Plaintiff counters that, despite the existence of a Suicide Prevention Policy, deposition testimony demonstrates the City of St. Louis has systematically failed to train its employees on the policy. Adams testified that she had never actually seen the Suicide Prevention Policy before her deposition and had never received training on the policy. (Adams Dep. 84:12-17) Further, Menning testified that he had never been informed of a transferee's Crisis Watch Status in the course of his many instances conveying inmates from the St. Louis City Justice Center. (Menning Dep. 71:19-74:2) Plaintiff cites to additional testimony from St. Louis City officials

that suggest employees were unaware of the Suicide Prevention Policy. (Pl.'s SAUMF in Opp'n to St. Louis City Defs.' Mot. for Summ. J. ¶ 40, ECF No. 105)

The City of St. Louis is correct that the existence of a Suicide Prevention Policy weighs in its favor. "A municipal policy 'cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides.'" *A.H.*, 891 F.3d at 728-29 ((quoting *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998)); *see Rellergert*, 924 F.2d at 797 ("Indifference is apathy or unconcern. The policy demonstrates the opposite . . . concern that inmates not commit suicide."). However, the existence of a policy itself will not prevent municipal liability "where the municipality's deliberate indifference to the need to train and supervise its employees causes an employee to violate a third party's constitutional rights." *A.H.*, 891 F.3d at 728.

In *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 925-26 (7th Cir. 2004), the plaintiff sued the jail's medical provider under § 1983 for failing to train and enforce its suicide prevention policies, which the plaintiff claimed ultimately resulted in the death of her grandson while he was a pretrial detainee. The plaintiff's own expert testified at trial that he had "no quarrel with [the facility's] suicide prevention procedures" and noted such polices were "based on some very good research." *Id.* at 926. "The problem . . . was that [the medical provider] systematically ignored its own suicide prevention procedures." *Id.* Ultimately, the jury found that the jail's medical provider acted with deliberate indifference to the decedent's suicide risk. *Id.* at 919-20.

The Seventh Circuit held that there was sufficient evidence for the jury to conclude that the medical provider's "actual practice (as opposed to its written policy) towards the treatment of its mentally ill inmates was so inadequate" that the facility was on notice that the decedent posed a substantial suicide risk. *Id.* at 927. The plaintiff presented evidence that one official had

neither completed an orientation program nor reviewed relevant instructions and another official

only received a copy of the manual after asking for one. *Id.* Further, the medical provider

"condoned the practice of its employees not completing its mental health intake forms." *Id.*

According to the Seventh Circuit, "a reasonable jury could find that [the medical provider's]

custom of repeatedly failing to follow proper procedures led to [the decedent's] successful

suicide attempt." *Id.* at 928.

While *Woodward* is a Seventh Circuit opinion and, therefore, nonbinding on this Court, it

is nevertheless persuasive in the absence of contradictory Eighth Circuit precedent.[14] Here, the

Court holds that Plaintiff has offered sufficient evidence that a reasonable jury could find that the

City of St. Louis's alleged failure to train its employees on the Suicide Prevention Policy

contributed to a continuing, widespread, persistent pattern of constitutional misconduct sufficient

---

[14] The Seventh Circuit follows the essentially the same analysis regarding liability for inmate suicide as the Eighth Circuit:

> We have said that deliberate indifference requires a showing of more than mere negligence (or even gross negligence) but less than purposeful infliction of harm. A detainee establishes a § 1983 claim by demonstrating that the defendants were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger. Although this is a high hurdle for a plaintiff, he need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge of a substantial risk of serious harm.*

*Woodward*, 368 F.3d at 926-27 (emphasis added) (citations and internal quotation marks omitted). With regard to municipal liability, *Woodward* explained:

> In [*Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)] we noted that there are two routes a plaintiff may take to establish municipal liability. First, a constitutional injury caused by a municipality may be "shown directly by demonstrating that the policy itself is unconstitutional." *Id.* More specific for this case, municipal liability can also be demonstrated indirectly "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id.* (quoting *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995)).

*Id.* at 927.

to be deliberately indifferent to inmates' suicide risks.[15]  Accordingly, the City of St. Louis's

motion for summary judgment with respect to Count IV is denied.

### (b) City of Jennings

The City of Jennings argues the Court should grant summary judgment in its favor on

Count X because Plaintiff cannot establish that it was deliberately indifferent by failing to train

its correctional officers to properly care for and supervise inmates.  Specifically, the City of

Jennings cites to its policy whereby it refuses to admit detainees with medical or mental health

conditions and instead immediately transfers any such detainee to a different facility better

equipped to handle such individuals.  The policy was enacted in response to a March 2013

incident in which another inmate committed suicide while in custody at the Jennings Detention

Center.  The City of Jennings argues that this policy implemented approximately one and one-

half years prior Brison's suicide and as a direct effort to ameliorate suicide risks proves it was

not deliberately indifferent to Brison's suicide risk.

As with the City of St. Louis, the City of Jennings is correct that the existence of a

relevant policy designed to prevent inmates who pose a suicide risk from remaining at the

Jennings Detention Center weighs in its favor.  However, as explained above, the existence of

such a policy will not itself absolve a municipality of liability if it was deliberately indifferent to

the need to train and supervise its employees in order to prevent constitutional violations.  *A.H.*,

891 F.3d at 728.  Plaintiff has offered evidence that the City of Jennings does not train its

---

[15] It is worth noting that Plaintiff need not necessarily show a history of suicides or suicide attempts of inmates at the St. Louis City Justice Center to establish a pattern of constitutional violations.  *See Woodward*, 368 F.3d at 929 (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997) ("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act. . . . That no one in the past committed suicide simply shows that [the jail] was fortunate, not that it wasn't deliberately indifferent.").  The alleged repeated failure of staff members to follow the Suicide Prevention Policy can itself be a violation of the constitution.

employees on the relevant policies and that the city knew its officials did not follow the screening procedures. (Pl.'s SAUMF in Opp'n to the Jennings Defs.' Mot. for Summ. J. ¶¶ 14-17, ECF No. 111) Consequently, the Court denies the City of Jennings's motion for summary judgment with regard to Count X

## 2.  Individual Liability

As explained above, the Constitution prohibits jail officials from acting with deliberate indifference towards risks of inmate suicide. *Whitney*, 887 F.3d at 860 ("The Eighth Amendment prohibits jail officials from acting with deliberate indifference towards risks of suicide. . . . The Fourteenth Amendment extends this protection to pretrial detainees.") (citations omitted).  The Eighth Circuit has established that a determination of an official's deliberate indifference requires an objective and subjective analysis.  *Id.* (citing *Jackson*, 756 F.3d at 1065). "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H.*, 891 F.3d at 726 (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).  As with the negligence claims, Plaintiff must show that (1) the specific defendant had actual knowledge that Brison posed a substantial risk of suicide and (2) the defendant failed to take reasonable steps to abate that risk.  *Id.* (citing *Coleman*, 349 F.3d at 538).

### *(a) Adams*

There is no question that Adams and the other individual named defendants in this case were acting under color of state law during their interactions with Brison.  *See West*, 487 U.S. at 48.  The Court must, therefore, determine whether each official violated a right secured by the Constitution or law of the United States.  *Id.*  As explained above, there is a genuine dispute as to

whether Adams actually knew Brison was on close observation and whether she informed Menning of such fact. Accordingly, the Court denies Adams's motion for summary judgment with respect to Count VI.

### *(b) Staples*

While Plaintiff cites to testimony from Staples and others that demonstrate his repeated failure to follow proper polices related to screening inmates, Plaintiff nevertheless fails to present any evidence that Staples *actually knew* Brison posed a substantial suicide risk to satisfy the objective analysis. *See Whitney*, 887 F.3d at 860. As with the negligence claim against Staples, the Court does not need to evaluate the subjective reasonableness of the steps taken during the booking process to reach a conclusion on Staples's right to summary judgment with regard to Plaintiff's claim under § 1983. *Hott*, 260 F.3d at 906. Consequently, the Court holds that Staples is entitled to qualified immunity and grants summary judgment in favor of Staples on Count XIII.

### **CLAIM ALLEGING UNCONSTITUTOINAL DEBTORS' PRISON**

Plaintiff's Petition also asserted a claim against the City of Jennings pursuant to § 1983 alleging the city operates an unconstitutional "modern debtors' prison scheme." (ECF No. 3, ¶ 205) The City of Jennings argues it is entitled to judgment as a matter of law because it did not detain Brison for his indigency; rather, the City of Jennings Municipal Court had imposed an alternative sentence that required attendance at a financial responsibility seminar and Brison's failure to complete that seminar and subsequent warrant for failure to appear were the predicate for his his ultimate detention by the City of Jennings.

The City of Jennings notes in its Reply Memorandum in Support of Their Motion for Summary Judgment that Plaintiff does not contest summary judgment in favor of the city on

Count XI. (ECF No. 125, at 3) In Plaintiff's Surreply, she clarifies the counts against the City of

Jennings and Staples to which she remains opposed to summary judgment: Counts VII, VIII, and

X. (ECF No. 132, at 3) Based on this assertion and the Court's reading of Plaintiff's

memoranda, the Court finds that Plaintiff has conceded summary judgment with regard to Count

XI. Therefore, the Court grants summary judgment in favor of the City of Jennings with regard

to Count XI.

## OTHER MOTIONS

### 1. Plaintiff's Motion to Exclude Affidavit of Fred Barker

When the City of St. Louis defendants filed their Motion for Summary Judgment, they

included an affidavit of Fred Barker as an attachment (ECF No. 93-5). On the same day Plaintiff

filed her Memorandum in Opposition, she also filed a Motion to Exclude Affidavit of Fred

Barker (ECF No. 102). Specifically, Plaintiff argues the City of St. Louis never disclosed Barker

pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i) or 26(a)(2)(A), nor did it disclose

Barker's name in written discovery prior to the discovery cutoff.

The City of St. Louis argues it, in fact, disclosed Barker as a potential witness in its initial

discloses. Specifically, the city provided the flowing language concerning additional individuals

likely to have discoverable information:

> Each of the medical professionals identified in Dejuan Brison's medical records,
> bates labeled "CITYSTL 00425" through "CITYSTL 00442," are likely to have
> discoverable information regarding Dejuan Brison's medical treatment. These
> individuals are not employees of the City of St. Louis, and are instead employees
> of Corizon, LLC ("Corizon"). The address of Corizon's local office is 12647 Olive
> Boulevard, St. Louis MO 63141.

(ECF No. 103-1, at 2) Along with Barker's affidavit, the City of St. Louis included the "Suicide

Watch Progress Note – Initial Visit" (ECF No. 93-5) and "Crisis Watch Status Form" (ECF No.

105-10), which Barker completed after evaluating Brison on October 3, 2014. These forms were

part of Brison's medical record and were bates labeled CITYSTL 00438-39 and CITYSTL 00440, respectively. Because both documents fell within the range of documents indicated in the city's initial disclosure, the City of St. Louis contends it satisfied the disclosure requirement because "[e]ven a cursory review of these 18 pages reveals that 'Fred P. Barker, LPC' signed the 'Suicide Watch Progress Note – Initial Visit' . . . and the corresponding 'Crisis Watch Status Form' downgrading Brison to 'close observation.'"[16]  (ECF No. 115, at 3)

Rule 26(a)(1)(A)(i) requires that a party's initial disclosures include "the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Additionally, Rule 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present" expert testimony.  Such an expert witness generally must provide a written report if the expert was "retained or specially employed to provide expert testimony in the case."  Fed. R. Civ. P. 26(a)(2)(B).  While the disclosure rule for non-retained experts who are not specifically retained for litigation – such as treating physicians – parties must nonetheless identify any non-retained expert and disclose "the subject matter on which the witness is expected to present" expert opinion testimony and "a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).  Rule 37 allows a district court to impose sanctions on a party who fails to provide information or identify a witness as required by Rule 26(a), which may include ordering "the party is not allowed to use

---

[16] The City of St. Louis and Adams further argue both documents signed by Barker were exhibits that were discussed during depositions.  Based on a review of the sections of deposition testimony cited by the parties, St. Louis City Justice Center's Chief of Security, Shirley Van Treece, was never asked about the signatures on "Suicide Watch Progress Note – Initial Visit" and "Crisis Watch Status Form."  She did, however, disclaim knowledge of other signatures on separate records presented during her deposition.

that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 700 (8th Cir. 2018), the plaintiff disclosed the names of several medical professionals and provided 573 pages of medical records as part of his initial disclosures. Despite not disclosing any expert witnesses, the plaintiff produced two expert reports days after the defendant moved for summary judgment. *Id.* at 701. On a motion by the defendant, the district court found that the plaintiff had violated the disclosure requirements of Rule 26(a)(2) and excluded the reports pursuant to Rule 37. *Id.*

The Eighth Circuit held that the district court did not abuse its discretion in excluding the expert statements. *Id.* at 708. Specifically, the Eighth Circuit rejected the plaintiff's argument that he had complied with the disclosure requirements by disclosing the names of several medical professional, including one designated as his treating physician, and producing his voluminous medical records. *Id.* at 703. "The expert witness disclosure requirements would be rendered meaningless if a party could ignore them and then claim that the nondisclosure was harmless because the other party should have read between the lines." *Id.* at 704.

The City of St. Louis attempts to distinguish *Vanderberg* from this case by noting Barker would not offer expert testimony on causation. The Court is not persuaded to disregard this Eighth Circuit precedent. The expert in *Vanderberg*, like Barker, was a treating physician rather than a retained expert specifically employed for litigation.[17] Even if Barker's affidavit and possible testimony would not be used to offer expert opinion on causation related to Brison's suicide, Barker's evaluation of Brison was seemingly based on knowledge, skill, experience,

---

[17] The City of St. Louis also tries to distinguish this case from *Vanderberg* by noting the range of documents it described in its initial disclosures was 18 pages compared to 573 in *Vanderberg*. The Court finds this is a distinction without a difference because the operative fact remains that the city failed to disclose Barker's name until it filed its motion for summary judgment.

training, or education that would qualify him as an expert witness pursuant to Federal Rule of Evidence 702.

Given how much of the City of St. Louis and Adams's argument in support of their Motion for Summary Judgment is based on the fact that a medical professional downgraded Brison from full suicide watch to close observation, it is reasonable to expect those defendants knew that the medical professional was likely to have discoverable information. Accordingly, the Court finds that the city should have provided Barker's name in its initial disclosure or supplemented its initial disclosure once it learned Barker was the medical provider who evaluated Brison on October 3, 2014. *See Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998) ("[F]ailure to disclose in a timely manner is equivalent to failure to disclose.").

Because the Court finds that Barker's evaluation of Brison and subsequent lowering of his status does not preclude liability against the City of St. Louis, the Court declines to utilize the extreme remedy of excluding his affidavit or testimony at trial. Notwithstanding the impact Barker's evaluation has on the merits of the claims at issue in the motions for summary judgment, the City of St. Louis should have disclosed Barker's name prior to submitting its Motion for Summary Judgment with Barker's affidavit as an attachment. Further, while the Court agrees with Plaintiff that Barker's signature on the "Suicide Watch Progress Note – Initial Visit" is indecipherable, Barker's printed name appears typed on the "Crisis Watch Status Form" above his signature. Nevertheless, Rules 26(a)(1)(A)(i) and 26(a)(2)(A) required the city to provide Barker's name and information. The Court, accordingly, denies Plaintiff's Motion to

Exclude Affidavit of Fred Barker. Plaintiff, however, shall be permitted to depose Barker prior to trial[18] with the City of St. Louis to cover associated costs.

## 2. Motions to Compel

### *(a) Answers to Interrogatories*

The City of St. Louis and Adams have filed a Motion to Compel (ECF No. 116) seeking answers to their separate amended interrogatories directed to Brooks on September 27, 2018. The interrogatories requested sworn answers from Brooks concerning her knowledge of facts related to her allegations against individual defendants employed by the City of St. Louis and Menning. (ECF No. 116-1)  Plaintiff suggests in her Memorandum in Opposition that the Court should deny this motion to compel as moot because the original plaintiff to whom the interrogatories were directed has died and, therefore, cannot provide sworn answers to the interrogatories at issue. (ECF No. 117)  Because the City of St. Louis and Adams did not file any reply to rebut Plaintiff's mootness argument and in light of the Court's ruling on the motions for summary judgment, the City of St. Louis and Adams's Motion to Compel is denied as moot.

### *(b) Financial Documents*

The City of Jennings has also filed a Motion to Compel Production of Financial Records (ECF No. 98) seeking documents related to Christina Brooks's business. In her Petition, Brooks indicated she was seeking to recover, in part, for her "pecuniary losses" sustained as a result of Brison's death. (ECF No. 3, ¶ 142)  During Brooks's deposition, she revealed that Brison had worked for her company from 2009 until his death in 2014. However, the City of Jennings argues none of the financial documents Brooks produced show information verifying Brison's

---

[18] The City of St. Louis and Adams note that, if the Court finds that Barker should have been disclosed previously as a non-retained expert, they would have no objection to Plaintiff deposing Barker prior to trial. (ECF No. 115, at 4 n.2)

employment or earnings. In their motion to compel, the City of St. Louis and Adams ask the Court to order Brooks to produce all documentation generated by PNC Bank and Regions Bank regarding Brooks's company in response to their previously issued subpoena.

In Brooks's Response Memorandum, she argues the subpoenas issued to the two referenced banks sought irrelevant information. Specifically, the subpoenas requested the banks produce documents regarding not only accounts held by Brooks's company and related loans, lines of credit, and monthly statements but also documents regarding accounts held by Brooks and Brison personally and related loans, lines of credit, and monthly statements. (ECF No. 99, at 3) Brooks further characterizes the request for financial documents as "amount[ing] to a financial audit of Ms. Brook's [sic] personal and business finances, without even the most remote connection to the pecuniary loss suffered by DeJuan Brison's children because of his death." (ECF No. 99, at 2)

When Cecilia Perry sought substitution as Plaintiff ad litem for Christina Brooks and the decedent's minor children on behalf of all beneficiaries pursuant to section 537.080, Mo. Rev. Stat., she also sought leave to file a First Amended Complaint. (ECF No. 140-1) The Court denied leave without prejudice. It is worth noting, however, that the Amended Compliant suggests Perry still seeks to recover for damages after "Plaintiffs sustained loss because of Brison's death in the nature of pecuniary losses, as well as the loss of Brison's companionship, comfort, counsel, support, guidance, and instruction." (*Id.* at ¶¶ 56, 97, 114)

Based on the record before the Court, it is unclear whether Brooks's financial records at issue in the City of Jennings's Motion to Compel are available and/or relevant in light of Brooks's death. Consequently, the parties are ordered to submit a joint status report concerning the impact of Brooks's death on the motion to compel financial documents.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant Kent Menning (ECF No. 84) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Defendants City of Jennings and Demetrius Staples (ECF No. 87) is **GRANTED in part and DENIED in part**. The Court grants summary judgment in favor of Staples on Counts VII and XIII and the City of Jennings on Count XI and with respect to Plaintiff's claim for punitive damages as to Counts VIII and X. A separate Order of Partial Dismissal accompanies this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Defendants City of St. Louis and Jermanda Adams (ECF No. 92) is **DENIED**.

**The following claims remain pending: Count I against Menning and Adams; Count IV against the City of St. Louis; Count VI against Adams; Count VIII against the City of Jennings; and Count X against the City of Jennings.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Affidavit of Fred Barker (ECF No. 102) is **DENIED**. Plaintiff shall be permitted to depose Barker prior to trial with the City of St. Louis to cover associated costs.

**IT IS FURTHER ORDERED** that the City of St. Louis and Adams's Motion to Compel (ECF No. 116) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that a status teleconference shall be conducted on July 18, 2019 at 1:00 p.m. during which time counsel for all parties shall participate and the Court will reset the trial date.

- 34 -

**IT IS FINALLY ORDERED** that the parties shall submit a joint status report no later

than July 15, 2019 explaining the impact of Brooks's death on the City of Jennings's Motion to

Compel Production of Financial Records (ECF No. 98) and prospective trial dates to be

discussed during the status conference.

Dated this ⧸ ⎯⎯ day of July, 2019.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**